Filed 6/24/22  In re J.W. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.W., a Person Coming Under the Juvenile Court Law. | D079636 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ4645) |
| v. | |
| H.H. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Ana L. Espana, Judge.  Conditionally affirmed and remanded with directions.

Vincent Uberti, under appointment by the Court of Appeal, for Defendant and Appellant, H.H.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant, John W.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Jesica N. Fellman, Deputy County Counsel, for Plaintiff and Respondent.

H.H. (Mother) appeals a jurisdictional and dispositional order in the Welfare and Institutions Code section 300[1] dependency proceeding for her son, J.W. Mother argues substantial evidence does not support the juvenile court's jurisdictional finding under section 300, subdivision (b). Mother also argues substantial evidence does not support the court's order removing J.W. from her custody under section 361, subdivision (c). Lastly, Mother argues the requirements under the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) were not satisfied.

John W. (Father) filed a separate appeal joining Mother's arguments regarding jurisdiction and removal.

We conclude substantial evidence supports the juvenile court's jurisdictional finding and removal order. However, because the San Diego County Health and Human Services Agency (the Agency) did not ask available extended family members about J.W.'s potential Indian ancestry, the Agency failed to comply with its initial inquiry obligations, and substantial evidence does not support the court's finding that ICWA does not apply. As such, we conditionally affirm, but remand for the limited purpose of requiring the Agency to complete its inquiry obligations.

---

1      All further section references are to the Welfare and Institutions Code, unless otherwise indicated.

FACTUAL AND PROCEDURAL BACKGROUND

A. Events Leading to Petition

Mother had a prior voluntary services case in 2016, due to concerns about her mental health and ability to care for her then-newborn son, J.H.[2] During that investigation, it was found Mother had developmental and/or cognitive delays. She received parenting services and attended counseling, and the case was successfully closed after about six months.

In 2018 and 2019, the Agency received reports that J.H. was at times left in a soiled diaper, played in the cat litter box, went to bed without dinner and may skip other meals, and was heard screaming because he was hungry. By this time, J.H. was diagnosed with autism. Several child welfare cases for general neglect were opened but closed as inconclusive.

In September 2020, a voluntary case was opened after the Agency received reports that Mother and Father, who is the father of J.W. but not J.H., constantly hit, punch, and "toss [J.H.] around." It was also reported Father verbally assaults J.H. A doctor observed bruising around multiple areas of J.H.'s left buttock. Mother claimed J.H. fell off a scooter four days prior, however, the doctor reported that bruising to the fleshy part and around multiple areas of the buttock would be unusual for a short fall with a single impact on a flat surface. The doctor expressed concern that the bruising on J.H.'s buttock was due to spanking, which constitutes physical abuse when done with enough force to cause bruises that last more than several minutes.

Father admitted spanking J.H. with an open hand, stating he "freaked out, [J.H.] was going to kill my cat." Mother defended Father and blamed the

_____

[2]    J.H. is not party to or a subject of this appeal and appellant Father is not J.H.'s father.

incident on J.H.'s behavior. J.H.'s biological father obtained full custody, Mother was limited to supervised visits, and a restraining order was put in place preventing Father from having contact with J.H.

Although Mother consistently denied having a relationship with Father during her voluntary services case regarding J.H., Father is the biological father of J.W. J.W. was born in May 2021. After giving birth to J.W., Mother planned to discharge to maternal grandmother's residence, however, Father did not want Mother to take J.W. and instead wanted to take him for a few days. Father did not cooperate with the hospital social worker, who suspected Father had mental health issues. Father threatened to sue the hospital and presented "interesting papers" purporting to assert the hospital was infringing on his freedom and rights if they would not allow him to visit J.W.

While the hospital social worker had some concerns, she did not believe there were any acute or immediate protective issues regarding J.W. She was under the impression Mother was "definitely going to her mother's house," and Father did not live there. The hospital social worker noted Mother was appropriate with J.W., and while she was at high risk for post-partum depression, she already had an appointment with her psychiatrist and was open to a social worker from Family Health Centers of San Diego (FHCSD) following up on her mental health needs. The hospital discharged Mother and J.W. on May 10, 2021.

The next day, Mother informed her voluntary services social worker that she was still at the hospital and was seeking advice because Father did not want her taking J.W. to maternal grandmother's home. Mother stated she felt "a little" unsafe with Father and gave the impression that there may have been a hostile situation with Father trying to coerce her to give him

4

J.W. Mother's voluntary services social worker called the hospital social worker, who indicated Mother was discharged the day prior.

Mother then admitted to her voluntary services social worker that she was discharged the day prior and was currently at paternal grandparents' home. According to Mother, paternal grandfather drove her and J.W. there after being discharged from the hospital. She admitted Father was also in the home but denied he was ever alone with J.W. Mother claimed she was going to maternal grandmother's home and that she had her dates mixed up regarding her discharge. When asked why she lied about being at the hospital that day, she stated she was "out of it."

On May 12, 2021, sheriff officers did a welfare check at paternal grandparents' home. Mother and J.W. were not there, although there was a crib, baby carriers, and baby supplies, which Father stated were from a baby shower. Father denied that Mother and J.W. were staying there. When social workers went to paternal grandparents' home, Father opened the door and stated he was video recording the interaction. He claimed he did not know where Mother and J.W. were, he would not allow the social workers to check the home themselves, and he produced a paper saying they were trespassing.

A social worker called maternal grandmother, who said Mother and J.W. were not at her residence either, and had not been there since they left the hospital. She believed they were with Father. They were supposed to arrive to her house on May 11, 2021, but she received a text from Mother indicating they would come on May 12, 2021. Maternal grandmother informed the social worker that Mother does not communicate well with her and she had concerns about Mother parenting J.W. on her own.

Mother appeared at maternal grandmother's house on May 13, 2021. She informed the investigating social workers that paternal grandfather picked her and J.W. up from the hospital and took them to see Mother's friends where they ended up staying the night before going to maternal grandmother's home the next evening. Mother claimed she lived with maternal grandmother and denied living with Father. She also denied that Father did not want her taking J.W. to maternal grandmother's house or that she said she felt "a little" unsafe around him. Mother had no concerns with J.W. being in Father's care. She admitted Father spanked J.H. but stated "[w]hat happened with my other son was a mistake and misconstrued." Mother admitted to having post-partum depression and agreed to a safety plan but would not sign it without consulting with her attorney.

Later that day, Mother changed her story again, admitting that after leaving the hospital, she went to Father's house for a few hours before going to her friend's house where she spent the night. She wanted Father to see J.W., who was supervised by paternal grandparents. She denied being in a relationship with Father and stated she planned to file for custody. Mother wanted Father to have supervised visits and indicated paternal grandparents and maternal grandmother could supervise. Mother was not willing to sign a safety plan for her to stay with maternal grandmother because she believed it caused problems resulting in J.H. being taken away from her despite a social worker explaining that the purpose was to safely keep J.W. with her.

In the course of the investigation, paternal grandparents were defensive of Father. Paternal grandfather told a social worker Father would never hurt J.W. and asserted J.H. is a different person with different circumstances. He stated J.H. would not let go of the cat after a verbal request and asked if they were supposed to let J.H. "strangle my cat." While

6

standing over Mother who was sitting on a couch, he told Mother that the two situations were not related. He denied Father physically abused other kids and did not understand what J.H. had to do with J.W. Paternal grandmother also asserted Father has never been violent, claiming the cat incident was the first time and would not happen again. According to paternal grandmother, if Father was a "child beater," J.H. would have had bruises before.

Maternal grandmother informed a social worker that Mother and Father are "very connected" and that Mother talks to Father, paternal grandfather, and paternal grandmother. She stated Mother lies to her and does not tell her much, but she believed Mother was still in a relationship with Father. She expressed concern that Father can be "deceptive" and wanted Mother to "hurry" to close her voluntary services case so that Mother could start spending time with him and spend the night at his house, which she did up until she had J.W. Maternal grandmother also indicated that when Father raises his voice at J.H. or tries to "step in and correct" him, Mother does not do or say anything to Father.

Mother's voluntary services social worker was also concerned that Mother could be influenced by Father and had not always been honest with the Agency regarding her contact or relationship with Father during the voluntary case. She was also concerned that Mother needed to be told what to do in order to protect J.W.

On May 20, 2021, a child family team (CFT) meeting was held with Mother, Father, paternal grandmother, paternal grandfather, maternal grandmother, Mother's voluntary services social worker, and the investigative social workers in attendance. Father claimed he had no problem holding himself accountable and admitted to spanking J.H. after he tried "everything" to get J.H. to let the cat go, although he did not intend to

7

leave bruises. Father had since successfully completed parenting and anger management services at McAlister Institute of Treatment and Education (McAlister). He claimed that after learning how to control his emotions and how he reacts, he would now take "both of [J.H.'s] arms to move him back or let him 'strangle the cat dead." Father declined to take any parenting classes, asserting he had enough at McAlister, but refusing to sign a release for the Agency to verify his services. Mother believed Father would not do anything to hurt anyone and said Father is not a danger to J.W. Mother and Father agreed that J.W. would stay with Mother at maternal grandmother's home until a doctor provided clearance for Father to visit J.W.[3] Father agreed to have video visits only in the meantime.

When social workers made an unannounced visit to maternal grandmother's home on May 24, 2021, maternal grandmother informed the Agency that Father had been harassing Mother. Mother, on the other hand, informed that Agency that she had no concerns about Father being around J.W. and thought it would be "okay" leaving J.W. with Father, stating "he is really good with him." She planned to co-parent with him although she would stay at maternal grandmother's house and be the main caregiver, and she had "no plans to be with him right now."

On May 26, 2021, Mother again asserted she was not dating Father and he was not her boyfriend. She also denied that Father had seen J.W. since the CFT meeting. Mother was not afraid that Father would hurt J.W. and stated he is "doing great" and has not shown any anger. Mother was attending parenting classes and therapy, although she had missed a child abuse class. Mother said she felt like her "normal self" and decided not to go

---

[3] A doctor had told Mother to wait until J.W. was two months old before bringing him out in public, due to the COVID-19 pandemic.

on post-partum depression medication because she would likely need to stop breastfeeding. She felt as though she had "covered everything" in her voluntary services case and had not decided whether she planned to continue child abuse group.

The next day, Mother sent an email to her voluntary services social worker stating "I would like to close the voluntary case with [J.H.] as I feel all of his needs have been met."

On May 28, 2021, a social worker spoke with maternal grandmother, who expressed "high concerns" about Mother's functioning level such as not understanding how to obtain medical insurance for J.W., not knowing how much to feed him, and not being able to do many things without help from others. Mother had been diagnosed with attention deficit hyperactivity disorder, bipolar disorder, borderline personality disorder, self-harming, unspecified mood disorder, and impulsivity in the past. She was recently offered medication but did not want to take it because she was breastfeeding. Maternal grandmother asserted Mother was living with Father before J.W. was born, and was still spending a lot of time at the paternal family home but lying about it. She believed Mother would move out and take J.W. to live with Father in paternal grandparents' shared home. She was concerned Father would get frustrated and lose his temper under the stress of a newborn, which could lead to him abusing J.W., as he did with J.H. She also worried Mother would fail to protect J.W. just as she failed to protect J.H. on multiple occasions, and paternal grandparents would cover up for Father, as they tried to do with J.H.

Later that day, maternal grandmother called the Agency to report that Mother left the house and said she was taking J.W. to see paternal

9

grandfather. Instead, maternal grandmother found mother sitting in a vehicle with Father, who was holding J.W.

When a social worker confronted Mother about bringing J.W. into contact with Father that day, Mother "continued to blatantly deny" it and told the social worker to call paternal grandfather who would deny that Father was present for the visit. She eventually admitted that she did bring J.W. to see Father and that she had also done so on one other occasion. She did not understand why she could not bring J.W. around Father. She indicated she planned to lift the restraining order protecting J.H., and bring him around Father as well. Mother had no concerns with J.W. being around Father and talked negatively about J.H., stating he has behavioral issues and had been pulling on the cat regularly.

The next day, May 29, 2021, a social worker received a text from Father stating, "[Mother] told me about your extortion and your threats imma [*sic*] personally see to it you and who ever [*sic*] is involved with this child trafficng [*sic*] goes to jail I warned you if you keep harassing me and [Mother] what I would do so guess what I'm filing charges against you." He asserted he was going to "file [a] power of attorney for [Mother] so anyone wants to talk to her has to go through me."

On May 30, 2021, maternal grandmother informed a social worker that Mother called the police on her. She texted the social worker a photo of a letter signed by Mother, Father, and paternal grandfather stating Mother was accepting a bag of baby clothes and supplies from Father and that Father agreed to help wash J.W.'s clothes and sheets. Maternal grandmother informed the social worker that she was not present for the signing of the letter and that paternal grandfather keeps showing up to her house daily.

The next day, Mother called her voluntary services social worker to ask about the status of her case closing. Mother stated Father was giving her a hard time. She felt she was doing everything she is supposed to for her mental health and wanted her case to close.

## B. Petition and Detention Hearing

On June 2, 2021, the Agency filed a petition for J.W. under section 300, subdivision (b)(1), alleging J.W. has suffered or there is substantial risk that J.W. will suffer serious physical harm or illness due to his parent's failure or inability to supervise or protect him and his parent's inability to provide regular care for him due to the parent's mental illness, developmental disability or substance abuse. The Agency alleged the following factual bases for the petition:[4]

> "On or about and between May [ ] 2021 to present the mother had a mental illness including but not limited to post-partum depression for which she has not obtained treatment and developmental delays which rendered her incapable of providing adequate care for this child. Additionally, the mother has failed to protect this child from [Father], who physically abused mother's 5-year-old autistic son in September 2020, and the mother and [Father] continue to deny the physical abuse, the mother declines to continue in voluntary services designed to protect her children from the risk of physical abuse and this child is in need of the protection of the Juvenile Court."

Concurrently with the petition, the Agency filed an application for a protective custody warrant. The Agency stated J.W. was currently with

[4] After trial, the juvenile court modified the language regarding the factual bases for petition, to conform to the evidence presented at trial. On appeal, Mother argues substantial evidence does not support the petition as modified. Thus, we quote and address the allegations of the petition as modified.

11

Mother at maternal grandmother's home and Mother refused to sign a safety plan with the Agency. The Agency was concerned that once Mother's voluntary case regarding J.H. was closed, Mother would take J.W. to live with Father, and they would not follow through with services and would not cooperate with the Agency. The protective custody warrant was issued and J.W. was detained in a foster home.

In its detention report, the Agency recommended that J.W. remain detained in a foster home or Polinsky Children's Center, and that Mother and Father have supervised visitation.

At the detention hearing on June 4, 2021, the court made a prima facie finding that J.W. is a child as described by section 300, subdivision (b) and that J.W.'s initial removal from Mother's custody was necessary. The court ordered J.W. detained in a foster home with liberal supervised visits and voluntary services for Mother and Father. The court set the jurisdiction and disposition hearing for June 24, 2021.

C. Jurisdiction and Disposition Report

In its jurisdiction and disposition report dated June 24, 2021, the Agency indicated that J.W. had adjusted well in the foster home.

When interviewed on June 10, 2021, Mother stated she was dishonest with the Agency and she should have been honest because it caused "a lot of problems." She admitted she was currently staying at Father's home, and had been staying with Father since her pregnancy with J.W. Mother agreed to be honest with the Agency going forward and further admitted that she continues to be in a relationship with Father and has support from his family. She had not been staying with maternal grandmother because they argue a lot. Mother wanted to continue her child abuse group and counseling.

12

When interviewed on June 11, 2021, Father stated he and Mother have been together since July 2020. He asserted they were co-parenting but were not living together and were not lying. He believed J.W. was taken into protective custody due to "false allegations of general neglect." He admitted he "spanked" J.H. but denied that he left bruises, urging that he was never charged by law enforcement because there was not enough evidence. He said he "only hit him 2 or 3 times, not even that hard," and complained that the petition "forgot to mention that this kid was choking my cat and I had to spank him. . . . Either I can let my cat die or do something."

On June 15, 2021, Mother's therapist from FHCSD informed the Agency that Mother completed her intake in December 2020. Mother reported being diagnosed with unspecified anxiety and mood disorder. The therapist thought Mother was motivated but required a higher level of care and more consistent sessions than the one session per month that is provided at FHCSD. Mother was referred to TERM for a psychological evaluation. Father was also referred to TERM for a psychological evaluation, individual therapy, and child physical abuse group.

When interviewed again on June 16, 2021, Mother understood that J.W. was brought into protective custody because she was lying to the Agency and allowed Father to visit with J.W. However, she did not agree that she failed to protect J.W. from Father. She also did not think what Father did to J.H. was intentional, stating that J.H. was "strangling the animals," "could be a little bit aggressive," has "behavioral problems," and can be "bratty sometimes." Mother said seeing the marks and bruises that Father caused to J.W. was "uncomfortable and shocking," although she believed it was a mistake and Father did not know his strength or how to handle J.H. She did

13

not have any concerns with Father hurting J.W. and asserted Father "has been loving and nurturing to [J.W.] even under pressure."

Mother was not sure if she had a developmental delay but knew she had a learning disability, although she did not believe it prevented her from caring for J.W. She also stated she had a mental health diagnosis and was in the hospital often as a teenager for self-harm and took psychotropic medication "on and off" as an adult. She did not take medication during her pregnancy to avoid risk of hurting J.W., but was now open to taking medication. Mother was willing to cooperate with the Agency and participate in services in order to get J.W. back into her care.

The Agency also talked to maternal grandfather and maternal grandmother on June 16, 2021. Maternal grandfather thought Mother needed counseling and would be a good mother if she could stay away from Father. Maternal grandmother believed Mother could not control her lying. For example, Mother had told maternal grandmother she was staying with a friend who had a baby, which is why she was taking J.W.'s baby things. However, Mother later admitted to maternal grandmother that she was actually staying with Father. Additionally, while Mother would call maternal grandmother for advice when J.W. would get fussy, she would otherwise does not listen to maternal grandmother. Maternal grandmother wanted to be assessed for placement and understood that once the assessment processes began, Mother would not be able to live with her.

On June 17, 2021, Father called the Agency social worker because he heard from maternal grandmother that she was going to have J.W. in her care. The social worker explained that all relatives who come forward have a right to be assessed for placement. The social worker heard another person on the phone telling Father "[y]ou don't have to do what they say." Father

14

became aggressive, refused to submit to drug testing, and stated he was not going to participate in services to get J.W. back. Father then passed the phone to "Michael," who claimed he was Father's power of attorney and stated all conversations with Father must go through him. The social worker explained that she could not speak to Michael due to the confidential nature of the case and ended the phone call after Michael began to get aggressive. The social worker texted Father to have him provide the Agency with a copy of his power of attorney. Father responded, questioning the social worker's background and how much the social worker gets paid for the drug test, asserting "I also charge 500 million per DNA sample which I will be billing to the stae [*sic*] to cps and to you and who ever [*sic*] is involved in this."

The Agency expressed concern about J.W.'s safety in Mother's and Father's care due to their mental instability, which can interfere with their ability to adequately care for and parent J.W. if left untreated. The Agency was also concerned that while both Mother and Father admit that Father physically abused J.H., they both continue to blame J.H. and minimize his injuries. Mother was willing to engage in services including continuing her child abuse and parenting classes. She also requested a psychological evaluation and was open to taking medication to stabilize her mental health. The Agency emphasized the importance of Mother gaining insight and articulating the risks of exposing J.W. to an environment where he could be physically abused. Father stated he completed anger management, therapy, and parenting classes, through McAlister but complained that he was "still being questioned" about what he did. He was not willing to engage in any other services, demonstrating his unwillingness to gain insight and learn coping skills to protect J.W. from his own triggers and erratic behavior.

15

## D. Special Hearings and Visitations After First Jurisdiction and Disposition Hearing Is Continued

From the very beginning of the jurisdiction and disposition hearing on June 24, 2021, an unidentified person immediately began interrupting the court in the background of the virtual hearing. The unidentified person asserted "the judge is not obeying the oath of office . . . the judge is denying me my freedom of speech." After attempting to obtain the identification of the person and unsuccessfully admonishing the person not to interrupt the court, the court directed the clerk to disconnect the unidentified person.

Mother's counsel informed the court that Mother no longer wanted legal representation. Mother indicated she would "hand over power of attorney to Michael C." When the court informed Mother there was no information showing that person is a licensed attorney, Mother asked the court to repeat itself because "my phone was taken away from me." Mother then stated she wanted to represent herself. The court relieved Mother's counsel of record.

Father's attorney also represented that Father "fired" her and was no longer communicating with her. The court relieved her as Father's counsel of record. Father did not respond to the court's questions and the court noted Father had voluntarily absented himself from the proceedings. The unidentified person interrupted again asserting "the judge has violated [Father's] due process of law. Let the record reflect the judge is not obeying his office. Let the record reflect that each and every one of you are proceeding without your amenities."

The Agency asked the court to admonish Mother, Father, and the unidentified individual that the proceedings are confidential and should not be recorded. Maternal grandmother informed the court that she wanted to be assessed for placement and that Mother had not been in her home on her own

16

accord since J.W.'s removal.  The court continued the jurisdiction and disposition hearing to August 20, 2021.

The Agency filed an addendum report on July 8, 2021, to report that Michael C. appeared as Father's "power of attorney" at a CFT meeting, and was seen recording the meeting on his cell phone.  After agreeing to the confidential nature of the meeting "under duress," he and Father became aggressive and asserted that the Agency was involved in kidnapping J.W., the Agency was participating in child trafficking, and the protective custody warrant was fraudulent and not signed by a real judge.  Father asserted he was not going to participate in any services.

After the CFT meeting, the Agency discovered Michael C. uploaded a video of the meeting online, which included mention of the social worker's first name and J.W.'s last name.  The Agency later discovered Michael C. uploaded another video wherein he shows a document that had information about the June 24, 2021 jurisdiction and disposition hearing as well as the full name of the presiding judge, and a third video that showed Father's name.  The court held a special hearing and strongly admonished the parties as to the confidential nature of the proceedings, and ordered that Mother and Father not disseminate any information regarding this matter to Michael C., and that any video or information posted on social media regarding this matter be removed.  Father interrupted the court throughout the hearing.

On July 14, 2021, Mother and Father visited J.W. together.  They fed J.W. a bottle, burped him, and took turns holding him.  At some point, J.W. became fussy and began crying.  J.W. gagged when Father attempted to feed him.  Father attempted again and J.W. gagged again.  The social worker told Father that it appeared J.W. was no longer hungry.  Father thought J.W. was congested and listened to his lungs.  Father firmly told Mother that J.W. was

17

sick and became upset asserting it was due to the foster caregivers' neglect. J.W. continued crying and Father began to yell at the social worker stating J.W. needed to be taken to the hospital. A security guard came in to tell Father to calm down. Father escalated and began to raise his voice and point his finger at the social worker, then began to cry out of frustration. Mother told the social worker she was going to have a panic attack and asked for help getting J.W. into his car seat. The social worker was able to get J.W. out of the room. The social worker then burped J.W. and heard him pass a lot of a gas. J.W. then fell asleep. Father caused a scene outside the building and called police and paramedics to the scene. The paramedics assessed J.W. while he was asleep in the social worker's arms and determined J.W. was fine.

Later that day, Mother informed the social worker she wanted an attorney appointed to represent her again and apologized for what happened during the visit.

On July 19, 2021, Mother had a positive visit with J.W. According to Mother, Father did not attend this visit because he "had things to do." When J.W. became fussy, Mother did a great job consoling him, demonstrated great patience, and was using skills from her parenting class. Later that day, Mother called to inform the Agency that she and Father were not currently speaking and requested separate visits from Father. She later called again, indicating she decided to continue having visits together with Father, but she wanted to be sure separate visits were an option in the future. The social worker confirmed this was possible and heard paternal grandfather in the background reprimanding Mother for requesting separate visits.

On July 26, 2021, Mother had another positive visit with J.W. Father did not attend again, but paternal grandmother and paternal aunt did

accompany Mother as support. Paternal grandmother asked about placement, however, once the social worker indicated Father and Mother would not be able to live with her if she is assessed for placement, she decided not to be assessed.

The court held another special hearing on July 29, 2021, to appoint counsel for Mother. Father again interrupted the court throughout the hearing. When the Agency recommended that Father accept appointment of counsel, Father stated he was "not accepting any help from any court officer because they are not competent." The judge then indicated that a federal case had been filed naming him as a party, requiring him to recuse himself from the matter.

At a subsequent special hearing with a different judge on August 11, 2021, Father asserted he would "take an attorney" only if "they recognize my status and so does the Court, and recognizes my status as a state national with limited diplomatic immunity . . . ." The court set a continued jurisdiction and disposition hearing for September 28, 2021.

E. Addendum Jurisdiction and Disposition Report

In its addendum report for the September 28, 2021 jurisdiction and disposition hearing, the Agency confirmed Father had declined services and had not participated in parent education or a psychological evaluation.

The Agency reported Mother completed her TERM psychological evaluation on July 23, 2021. Mother's diagnoses were borderline intellectual functioning, adjustment disorder with mixed anxiety and depressed mood, and "child physical abuse, suspected, subsequent encounter." Additionally, Mother had a low cognitive function and her scores fell within the range of impairment, with her learning disorder being consistent with her cognitive

19

score.  The psychologist reported that Mother was guarded during her interview and did not want to talk about certain things.

On August 23, 2021, Mother told the Agency that she "felt really stressed out and upset yesterday" and had felt unstable and suicidal.  She called a crisis line and spoke with paternal grandfather and felt better soon after.  She was still living with Father in paternal grandparents' home and had still not begun taking her psychotropic medications prescribed by her doctor at FHCSD.  Mother informed the Agency she found out J.H. had been aggressive with other animals.  The social worker explained that due to his autism, it is the adult's responsibility to teach him appropriate ways to redirect behaviors rather than reacting with physical discipline.  When asked to describe Father's reactions toward J.H., Mother responded, "I don't know." The social worker explained that Mother needs to gain insight into how adult behaviors puts her children at risk of physical abuse and she needs to know how to protect them.  Mother then stated, "I wasn't honest with the Agency. I left [J.H.] with [Father] because I did not know how to handle him and I never intended for this to happen."

On September 7, 2021, Mother's therapist from FHCSD informed the Agency that Mother would be discharged from therapeutic and psychiatry services on October 16, 2021, because mother needed a higher level of care than what FHCSD could provide.

On September 17, 2021, Mother informed the Agency that she planned to move in with friends, but had not yet told Father.  Also, she began taking her psychotropic medicine on August 23, 2021, but did not feel that it was working.  Mother reported she had been attending her child abuse classes and was trying to focus on herself and her mental health.

On September 20, 2021, Mother's therapist from TERM stated that Mother was making some progress and "understands what is important" and "does not know how to change things but is well aware of what is not right." Mother informed the Agency she planned to move in with her friends the following day.

The Agency reported Mother had engaged in voluntary services including weekly therapy sessions with TERM, in-home parenting, completing a psychological evaluation, monthly therapy sessions with FHCSD, and psychotropic medication management with FHCSD. Father, on the other hand, declined all services, and all service providers reported that he threatened to pursue legal action against them. The Agency was concerned about Father's behavior and resistance to learning coping skills for his triggers and frustrations. Also concerning was that Mother still could not articulate the risks of exposing J.W. to an environment where he could be physically abused, as well as articulate how she will protect J.W.

### F. Jurisdiction and Disposition Hearing

At the jurisdiction and disposition hearing on September 28, 2021, the Agency and J.W.'s counsel both asked the court to sustain the petition and remove J.W. from Mother's and Father's custody. Mother asked the court to dismiss the petition, or if the court made a true finding on the petition, asked that J.W. be placed with her. Mother stipulated she would be willing to live with maternal grandmother if J.W. were placed in her care. Likewise, maternal grandmother stipulated that if J.W. were placed with Mother, she was willing to have Mother and J.W. live with her. Father, representing himself, argued the Agency had not come forward with a real claim.

21

The court found by clear and convincing evidence that the allegations of the petition as modified[5] were true and that J.W. was a child described within section 300, subdivision (b). As to disposition, the court likewise found by clear and convincing evidence that removal of J.W. from Mother's and Father's custody was appropriate under section 361, subdivision (c)(1). The Agency informed the court that the assessment of maternal grandmother's home was in the process of being completed and Mother would not be able to move in with maternal grandmother without prejudicing the assessment. The court placed J.W. in a licensed foster home.

## DISCUSSION

Mother argues substantial evidence does not support the juvenile court's jurisdictional finding and dispositional order. We disagree.

Mother also argues ICWA requirements were not met. We agree and conditionally affirm, remanding for the limited purpose of ICWA compliance.

### A. Jurisdiction Finding

Mother claims substantial evidence does not support the finding that she suffered from untreated post-partum depression and there is no evidence her mental health issues or developmental delays had any impact on her ability to safely care for J.W. Additionally, while she does not deny Father's physical abuse of J.H., she argues the juvenile court's dependency jurisdiction cannot be based on a single incident where there is no evidence of ongoing risk of further incidents or harm to J.W. She claims J.H. is differently situated and substantial evidence does not support a finding that Mother and Father minimized the incident. Lastly, Mother argues her failure to continue voluntary services cannot provide a basis for jurisdiction where there is no substantial evidence of a substantial risk of harm to J.W. in the first place.

---

5     See *ante*, footnote 4.

22

Section 300, subdivision (b)(1) authorizes dependency jurisdiction if a child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent . . . to adequately supervise or protect the child, . . . by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1).)

On appeal, we review the record for substantial evidence to support the juvenile court's section 300 jurisdictional findings. (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 137.) In so doing, we consider the entire record, draw all reasonable inferences in favor of the prevailing party, and then affirm the order if substantial evidence supports court's findings. (*Id.* at pp. 137–138.) A finding is supported by substantial evidence if a trier of fact could reasonably make that finding in light of the entire record. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393–1394.).) We must affirm an order that is supported by substantial evidence even if other evidence, or other inferences from the evidence, would have supported a contrary finding. (*In re N.M.* (2011) 197 Cal.App.4th 159, 168 (*N.M.*).) The appellant has the burden to show there is insufficient evidence to support the juvenile court's order. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103 (*Lana S.*); *N.M.*, at p. 168.)

Juvenile dependency proceedings are intended to protect children who are currently being abused or neglected, "and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) Although "the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm" (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824), the court may nevertheless consider past events when determining whether a child

23

presently needs the juvenile court's protection. (*In re Troy D.* (1989) 215 Cal.App.3d 889, 899–900.) A parent's past conduct is a good predictor of future behavior. (*In re Petra B.* (1989) 216 Cal.App.3d 1163, 1169–1170.)

Here, based on our review of the record, substantial evidence supports the juvenile court's true finding on the allegations in the petition as modified by the court. The petition alleged that between May 2021 to present, Mother had a mental illness "including but not limited to post-partum depression . . . and developmental delays." Indeed, the results of Mother's July 23, 2021 psychological evaluation included diagnoses of borderline intellectual functioning, and adjustment disorder with mixed anxiety and depressed mood. The psychologist noted Mother had a low cognitive function, consistent with her learning disorder.

There is also substantial evidence that Mother's mental health issues rendered her incapable of providing adequate care for J.W. As recently as five weeks before the jurisdictional and dispositional hearing, Mother became stressed and upset, to the point that she felt unstable and suicidal. Mother had just begun taking her psychotropic medication at that time and she did not feel that it was working, providing substantial evidence that her mental illness remained untreated. Further, just three weeks before the hearing, Mother's therapist from FHCSD stated Mother would be discharged because she needed a higher level of care than what FHCSD could provide. And her therapist from TERM stated that she was making some progress and understood what is not right, but still "does not know how to change things."

To the extent Mother cites evidence and argues that she was appropriate with J.W. in the hospital after his birth and during supervised visits thereafter, she misconstrues and/or misapplies the substantial evidence standard of review. (*N.M.*, *supra*, 197 Cal.App.4th at p. 168.) That is, we

24

must affirm the court's jurisdictional finding where it is supported by substantial evidence even if other evidence would have supported a contrary finding. (*Ibid.*)

Because substantial evidence supports the juvenile court's finding that Mother's mental illness or developmental delays rendered her incapable of providing adequate care for J.W., we need not address whether substantial evidence supports the jurisdictional finding based on Father's physical abuse of J.H. (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1127 ["[T]he juvenile court's jurisdiction may rest on a single ground"].) Nonetheless, we briefly address Mother's argument that jurisdiction cannot be based on the single incident involving J.H. because there is no evidence of ongoing risk of further incidents or harm to J.W.

As an initial matter, there is substantial evidence Mother and Father continued to minimize the physical abuse and deny that there was an issue with what Father did to J.H. While Mother argues that she said what happened was "uncomfortable and shocking," she also claimed what happened to J.H. was "a mistake and misconstrued," and she did not think what Father did was intentional. Mother also blamed J.H. asserting he had behavioral issues and was "bratty sometimes." It is concerning that Father claimed to hold himself accountable and explained that he did not intend to leave bruises, but later denied that he left bruises. Father also stated he "only hit him 2 or 3 times, not even that hard," which is not merely explaining what happened but rather expressing there was nothing wrong with what he did.

Father's refusal to participate in any services to learn skills to cope with his triggers and erratic behavior is further evidence that a substantial risk of harm to J.W. existed at the time of the jurisdictional and dispositional

hearing. (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["[o]ne cannot correct a problem one fails to acknowledge"]; *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 ["denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision"].)

Mother's argument on appeal that Father's physical abuse of J.H. cannot support a finding of risk to J.W. holds no weight. Substantial evidence shows the risk caused by Father was not limited to J.H. or J.H.'s autistic behavior. As recently as two and one-half months before the jurisdictional and dispositional hearing, Father became frustrated and upset to the point that he began to cry, raise his voice to a social worker, and accused the foster caregivers of neglect all because J.W. would not stop crying during a visit. A security guard could not get Father to calm down, and Father ultimately called the police and paramedics. As it turned out, J.W. simply needed to pass gas. During this incident, Mother felt that she was going to have a panic attack and asked the social worker for help, showing Mother's inability to adequately protect J.W.

Mother's final argument that jurisdiction cannot be based on her declining to continue further voluntary services fails because it is based on a false premise. Mother argues the lack of voluntary services cannot pose a risk to J.W. if there is no substantial risk of harm to J.W. in the first place. As discussed above, Mother's untreated mental illness and developmental delays as well as Father's past physical abuse to J.H. and continuing erratic behavior, created a substantial risk that J.W. would suffer serious physical harm.

In summary, substantial evidence supports the court's jurisdictional findings.

26

## B. Removal from Custody

Mother further challenges the sufficiency of evidence to support the court's dispositional order removing J.W. from her custody under section 361, subdivision (c). Mother's arguments regarding the juvenile court's dispositional findings are similar to the arguments she raises regarding the jurisdictional findings. She contends there was "very little evidence" that J.W. would be in any danger in her custody because there was no evidence her mental health issues and developmental delays impaired her ability to safely parent J.W. and the single incident of Father's physical abuse of J.H. was too far removed to justify removal of J.W. Mother claims any risk posed by Father was resolved because she was no longer living with Father at the time of the hearing and she was being protective. Mother also argues there were reasonable means of protecting J.W. other than removal such as frequent unannounced visits, in-home services, or ordering Mother to reside with maternal grandmother. Contrary to Mother's assertions, we conclude substantial evidence supports the juvenile court's finding that removal of J.W. from Mother's custody was necessary and that there was no other reasonable means to protect J.W.

After a juvenile court exercises jurisdiction over a child pursuant to section 300, it must determine the appropriate disposition for that child. (§§ 360, subd. (d), 361, 362; *N.M.*, *supra*, 197 Cal.App.4th at p. 169.) The court has broad discretion in choosing an appropriate disposition that serves the child's best interests. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.)

Section 361, subdivision (c), provides in pertinent part: "A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any

27

of the following circumstances . . . : [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c).)

"In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.) A child does not have to be "actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 135–136.)

We review a removal order for substantial evidence. (*In re V.L.* (2020) 54 Cal.App.5th 147, 154.) Because section 361, subdivision (c) requires proof by clear and convincing evidence, we determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011 (*O.B.*); see also *In re V.L.*, at pp. 154–155 [standard of review described in *O.B.* applies to removal findings under § 361, subd. (c)].) Still, we must affirm an order that is supported by substantial evidence even if other evidence, or other inferences from the evidence, would have supported a contrary finding. (*N.M.*, *supra*, 197 Cal.App.4th at p. 168.)

As we have discussed, substantial evidence supports a finding that J.W. faced a substantial risk of harm as a result of Mother's untreated mental illness and developmental delays as well as Father's past physical abuse and continuing erratic behavior.

28

Mother's argument that she was no longer living with Father at the time of the hearing does not reduce that risk. Mother informed the Agency only 11 days prior to the hearing that she planned to move in with friends. She supposedly made the move only seven days prior to the hearing. Additionally, Mother had previously lied about her whereabouts. At the hospital after J.W. was born, Mother assured the hospital social worker that she was going to maternal grandmother's house. Instead, paternal grandfather picked her up after she was discharged and took her and J.W. to paternal grandparent's home where Father lived. The next day, Mother lied to the Agency and said she was still at the hospital. She lied to the Agency once again, claiming she went straight to a friend's house after being discharged, when she was actually with Father. Mother also told maternal grandmother that she was staying with a friend, when she was really staying with Father. Even when Mother was actually staying with maternal grandmother, she lied about seeing Father and allowing Father to see J.W.

On appeal, Mother points to some evidence suggesting she had developed insight into the need be protective of J.W. However, it is not this court's role on appeal to reweigh the evidence, but rather to determine whether " 'it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' " (*In re Savannah M.*, *supra*, 131 Cal.App.4th at p. 1394.) The juvenile court could reasonably conclude it was highly probable that J.W. would still be at risk of harm based on evidence that shows Mother had not yet fully separated herself from Father and did not have a firm grasp on the risk of harm that Father caused. Again, while a therapist stated Mother now "understands what is important" she still "d[id] not know how to change things." When asked most recently to describe Father's reactions toward J.H., Mother merely stated "I don't know."

29

Additionally, the record shows Father was exercising control over Mother's decisions. Father had been pressuring Mother to close her voluntary services case regarding J.H. When J.W. was born, Mother asked a social worker for advice because she felt unsafe and Father did not want her taking J.W. to maternal grandmother's house after being discharged. She later admitted that she was already at paternal grandparent's house with Father, and claimed she had her dates mixed up and was "out of it." She then denied that Father did not want her taking J.W. to maternal grandmother's house or that she ever felt unsafe around Father. Mother's voluntary services social worker expressed concern that Mother can be influenced by Father.

In the course of the investigation, Father asserted control over Mother, claiming he was going to file a power of attorney for her and anyone from the Agency would need to talk to Mother through him. At the initial jurisdiction and disposition hearing on June 24, 2021, Mother informed the court that she no longer wanted legal representation and sought to "hand over power of attorney to Michael C.," the person who spoke for and seemingly defended Father throughout the proceedings. During the hearing, someone took the phone away from Mother, supporting an inference that someone was controlling her conduct during the hearing. Mother was living with Father at this time.

Overall, Mother's assertion that she was being protective and resolved the risk posed by Father asks this court to reweigh the evidence, something we cannot do. We therefore conclude the record contains sufficient evidence to support the court's finding that there would be a substantial risk of harm to J.W. if he were not removed from Mother's custody.

Mother cites no evidence or authority for her argument that in-home services or more frequent unannounced visits were viable alternatives to removal that would address the risks and circumstances in this case. (Compare with *In re Henry V.* (2004) 119 Cal.App.4th 522, 529–531 [reversing removal order where child was removed for single, serious incident of physical abuse; social worker testified about in-home services that could mitigate risk of further physical abuse, including unannounced visits, public health nursing services, and in-home counseling, and mother was "fully cooperative"].) To the contrary, there is evidence these alternatives proposed by Mother would not work. They turn on social workers or service providers having access to Mother's friend's home and, as already noted, Mother has been dishonest with the Agency about her residence and whereabouts.

There is also no evidence that an order requiring Mother to reside with maternal grandmother was an adequate means of protecting J.W. Mother and maternal grandmother did not have an established stable relationship, which the juvenile court noted. Indeed, maternal grandmother stated Mother does not listen to her, lies to her, and does not tell her much. Further, as already noted, the last time Mother and J.W. were staying with maternal grandmother, Mother lied to maternal grandmother and the Agency about seeing Father and allowing Father to see J.W.

In summary, substantial evidence supports the juvenile court's findings, under a clear and convincing standard, that there would be substantial danger to J.W. if he were returned to Mother's custody, and that there was no other reasonable means to protect J.W.

## C. ICWA

Mother argues the Agency and the court failed to comply with the ICWA requirements because there is no evidence the Agency made ICWA

inquiries of any family members other than Mother, Father, and an attempt to contact paternal grandmother.

Mother also argues it is impossible to determine whether ICWA "notice requirements" were satisfied once Father claimed potential Apache ancestry because the record does not contain the contents of the Agency's contacts with various tribes and there is no way to know what information was provided to those tribes.

We conclude the Agency was not required to provide formal notice to any tribes because there was no "reason to know" that J.W. was an Indian child. However, we conclude the Agency failed to satisfy its initial inquiry obligations because it did not ask available extended family members about J.W.'s potential Indian ancestry. The Agency concedes this issue. As such, we conditionally affirm, but remand with directions for the Agency to comply with its initial inquiry obligations.

1. Additional Facts

In its June 2, 2021 petition, the Agency indicated a social worker made an inquiry of Mother, who gave the social worker no reason to believe J.W. is or may be an Indian child. The Agency did not provide any information about whether it made an inquiry of Father, and noted it had not yet completed its inquiry.

In its June 3, 2021 detention report, the Agency reported it was unknown whether Father had any Indian ancestry. The Agency confirmed Mother denied having any Indian ancestry on May 13, 2021.

At the detention hearing on June 4, 2021, Mother again confirmed she had no Indian ancestry. Father indicated he may have Indian heritage, specifically, Apache. The court ordered the Agency to begin its reasonable

32

efforts to verify Father's claim of possible Apache heritage and provide notice accordingly. The court deferred on the ICWA issue.

On June 11, 2021, Father informed the Agency that his mother's mother (paternal grandmother's mother) had a small amount of Apache but it was not enough to be a registered tribal member. No one from his family was a registered tribal member or had ever lived on a reservation. According to Father, his paternal grandmother's mother had passed away five or 10 years ago and no other family members had any more information regarding his ancestry.

The Agency interviewed maternal grandmother and maternal grandfather on June 16, 2021, but there is no indication the Agency asked them about J.W.'s potential Indian ancestry.

The Agency called paternal grandmother and left voicemails on June 17 and 18, 2021, to inquire about her potential Apache ancestry but did not receive a return call.

At the jurisdiction and disposition hearing on June 24, 2021, the Agency indicated it needed to finish its inquiry as to Father's alleged Apache heritage.

In its addendum report for the September 28, 2021 jurisdiction and disposition hearing, the Agency noted that paternal grandfather attended a visitation on June 30, 2021. However, there is no indication the Agency asked him about J.W.'s potential Indian ancestry. Likewise, paternal grandmother and paternal aunt attended a visitation on July 26, 2021, but there is no indication the Agency made any ICWA inquiry.

The Agency reported that it sent letters to eight Apache tribes to further inquire whether J.W. is or may be an Indian child. Seven of those tribes sent responsive letters, which the Agency attached to its report, stating

33

that J.W. was not eligible for membership in those tribes. The eighth tribe did not respond after five follow up emails and five follow up calls.

The court found that ICWA does not apply to this case.

### 2. Applicable Law

Congress enacted ICWA to address concerns regarding the separation of Indian children from their tribes through adoption or foster care placement with non-Indian families. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) Under California law adopted pursuant to ICWA, the juvenile court and Agency have an "affirmative and continuing duty to inquire" whether a child "is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W.*, at p. 9.) An "Indian child" is defined in the same manner as under federal law, i.e., as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" (25 U.S.C. § 1903(4); accord Welf. & Inst. Code, § 224.1, subd. (a) [adopting the federal definition].)

As outlined by this court in *In re D.S.* (2020) 46 Cal.App.5th 1041, 1052 (*D.S.*), "section 224.2 creates three distinct duties regarding ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply."

34

During the first stage of initial inquiry, "[s]ection 224.2, subdivision (b) specifies that once a child is placed into the temporary custody of a county welfare department, such as the Agency, the duty to inquire 'includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child.' " (*D.S., supra,* 46 Cal.App.5th at pp. 1048–1049.)

ICWA defines " 'extended family member' " by "the law or custom of the Indian child's tribe" or, absent such law or custom, as "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c) [" 'extended family member' . . . defined as provided in [§] 1903" of ICWA].)

"On appeal, we review the juvenile court's ICWA findings for substantial evidence." (*D.S., supra,* 46 Cal.App.5th at p. 1051.) However, where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied. (*Ibid.*)

3. Analysis

The juvenile court's finding that ICWA was inapplicable implied that the Agency fulfilled its inquiry duty. (See *In re Austin J.* [(2020) 47 Cal.App.5th 870, 885 [a finding that "ICWA does not apply" implies social workers and court "did not know or have a reason to know the children were Indian children and that social workers had fulfilled their duty of inquiry"].) The record does not support these findings.

The Agency concedes its initial ICWA inquiry was deficient because it did not ask extended relatives who were available to the Agency whether J.W. is or may be an Indian child. Although paternal grandmother did not

35

return the Agency's calls when it sought to make a further inquiry regarding Father's claim of potential Apache ancestry, she did subsequently attend a visitation with Mother and there is no indication the Agency used this opportunity to conduct an ICWA inquiry. Likewise, paternal grandfather and paternal aunt attended a visitation, however, there is no indication the Agency asked them about J.W.'s potential Indian ancestry. The Agency also interviewed maternal grandmother and maternal grandfather but did not make an ICWA inquiry. Because these individuals all qualify as extended family members under ICWA, the Agency was required to ask them about J.W.'s potential Indian ancestry, and the juvenile court had to ensure this inquiry took place before it could find ICWA did not apply. (*D.S.*, *supra*, 46 Cal.App.5th at pp. 1048–1049.) On this record, we must conditionally affirm and issue a remand so the Agency and juvenile court can comply with these obligations.

Mother also argues there is no way to determine whether the Agency complied with its "notice requirements" because the contents of its communications with the eight Apache tribes are not included in the record. The duty to provide formal notice, however, is triggered only where there is a "reason to know" the child is an Indian child. (§ 224.3 [formal ICWA notice is required if there is a "reason to know" a child is an Indian child as defined under § 224.2, subd. (d)].)

A "reason to know" exists under any of the following circumstances: "(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child;  [¶]  (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native

36

village;  [¶]  (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child;  [¶]  (4) The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child;  [¶]  (5) The court is informed that the child is or has been a ward of a tribal court; and  [¶]  (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe."  (§ 224.2, subd. (d).)

Here, Father's claim that he may have Apache heritage stemming from paternal grandmother's mother did not give rise to a "reason to know" that J.W. is an Indian child.  To the contrary, Father stated paternal grandmother's mother did not have enough Apache to be a tribal member and no one from his family was a registered tribal member or ever lived on a reservation.  Thus, the Agency was not required to provide formal notice to any tribes because there was no "reason to know" that J.W. was an Indian child.

To the extent Mother intends to argue that Father's claim of potential Apache heritage gave rise to a "reason to believe" that J.W. is or may be an Indian child, Mother cites no authority requiring that the record include the contents of the Agency's further inquiry communications with tribes (i.e., copies of letters).  (See § 224.2, subd. (e)(2)(C) [when there is a "reason to believe" a child is an Indian child, further inquiry includes contacting tribes by "telephone, facsimile, *or* electronic mail"], italics added; compare with § 224.3, subds. (a)(1), (c) [when there is a "reason to know" a child is an Indian child, formal notice "shall be sent by registered or certified mail with return receipt requested" and proof of formal notice, including copies of

notices sent and all return receipts and responses received, shall be filed with the court].)

## DISPOSITION

The juvenile court's jurisdiction and disposition order is conditionally affirmed. The matter is remanded to the juvenile court with directions to comply with the inquiry provisions of ICWA and section 224.2 (and, if applicable, the notice provisions under section 224.3), including inquiry of paternal grandmother, paternal grandfather, maternal grandmother, maternal grandfather, and paternal aunt. If, after completing its inquiry, neither the Agency nor the juvenile court has reason to believe or reason to know J.W. is an Indian child, the order for the jurisdiction and disposition hearing shall be reinstated. If the Agency or the juvenile court has reason to believe or reason to know J.W. is an Indian child, the juvenile court shall proceed accordingly.

McCONNELL, P. J.

WE CONCUR:


HUFFMAN, J.


DATO, J.

38